PULLMAN TRUST AND SAVINGS
BANK, an Illinois corporation,
Plaintiff,
v.
UNITED STATES of America,
Defendant.
No. 60 C 1610.

United States District Court
N. D. Illinois, E. D.
Sept. 19, 1963.

Don S. Harnack, Chicago, Ill., for plaintiff.

Robert Sama, Sp. Atty., Dept. of Justice, Washington, D. C., for defendant.

WILL, District Judge.

This is an action brought by plaintiff, Pullman Trust and Savings Bank (hereinafter sometimes referred to as the "New Bank"), for the return of federal income tax deficiencies for calendar years 1955 and 1956 assessed by the Commissioner of Internal Revenue on May 7, 1959, and paid by plaintiff on May 14, 1959. The Court's jurisdiction is provided by 28 U.S.C. § 1346(a) (1).

Plaintiff was incorporated in 1932 and has engaged in banking operations at 400 East 111th Street, Chicago, continuously since it opened. In 1955 and 1956, it filed federal income tax returns with the District Director of Internal Revenue at Chicago, and in those returns it claimed bad debt deductions of $160,600.00 and $229,020.62 respectively. The Commissioner denied these deductions (and one other in each year not here in issue). As a result, he assessed deficiencies in the amounts of $84,552.00 and $120,130.82 respectively. Plaintiff paid these sums, plus interest, and in October, 1959, it filed timely claims for refund in the amounts of $83,512.00 and $119,090.82, respectively, plus interest. These claims were predicated upon plaintiff's assertion that its original determinations of its allowable bad debt deductions were correct and in accordance with the procedure set forth in Mimeograph 6209, 1947–2 Cum.Bull. 26, as supplemented. On October 12, 1960, plaintiff, having received no notice of allowance or disallowance of these claims, commenced this litigation.

### 1. History of the Plaintiff

Plaintiff's predecessor, The Pullman Trust and Savings Bank (hereinafter referred to as the "Old Bank"), was incorporated under the banking laws of the State of Illinois in 1907. It was dissolved in 1940. From April 30, 1932 until its dissolution the Old Bank was in liquidation.

During the late 1920's and early 1930's, the Old Bank's solvency and liquidity became increasingly impaired. The bank's net worth declined drastically and, according to the report of the State Auditor of Public Accounts as of February 23, 1932, slow, doubtful and worthless loans and receivables totalled substantially more than the bank's capital and surplus.

The Old Bank's majority shareholder, the Pullman Car and Manufacturing Corporation (hereinafter referred to as the "Pullman Company"), risked considerable sums to prevent the bank's insolvency. In 1931, for example, the Pullman Company added more than $1,-000,000 to its deposits in the Old Bank. In February, 1932, depositors of that bank were informed that the Pullman Company had substantial amounts on deposit and was, "if necessary, prepared to add to such deposits in order that the Bank may be at all times in position to meet, with its other realizable assets, any requirements for immediately available cash."

In April, 1932, the State Auditor ordered the Old Bank to write off its books more than $111,000 of bad debt losses relevant to this case. (The bank did not comply with this order during 1932). At this point it became clear that the bank needed an immediate infusion of additional funds in order to replenish its capital. Three alternatives presented themselves: a 100% involuntary assessment upon shareholders pursuant to the provisions of section 11 of the Illinois Banking Act, Ill.Rev.Stat.1931, ch. 16½, § 11 (which, it was believed, would result in the bank's demise); a voluntary assessment upon shareholders (it was expected, however, that only the Pullman Company would pay); or a reorganization of the bank in accordance with the terms of section 12 of the State Banking

Act. The last alternative was selected in part because the State Auditor was of the opinion that no other was likely to permit the bank to continue in operation.

On April 29, 1932, plaintiff, bearing the same name as the Old Bank, except for the initial word "The", was incorporated. The Pullman Company and individuals associated with it subscribed for all 3000 authorized shares at $167.00 per share and paid $501,000 in cash therefor. All other stockholders of the Old Bank were given the opportunity to subscribe at the same price, but no others accepted the offer.

The New Bank elected as its directors the same persons then also serving as directors of the Old Bank, and it chose as its officers the officers of the Old Bank. From the first day it opened its doors, on Monday, May 2, 1932, it used as its banking facilities the identical premises used through the previous Friday, April 29, by the Old Bank. To all intents and purposes, the Old Bank and the New Bank constituted one and the same continuous banking operation.

Section 12 of the Illinois Banking Act, Ill.Rev.Stat.1931, ch. 16½, § 12, provided in relevant part the following:

"With the approval in writing of the Auditor of Public Accounts, which approval shall state that the proposed sale is, in his opinion, necessary for the protection of the depositors and other creditors, any corporation with banking powers may, by a vote of two-thirds of its directors and without a vote of its stockholders, sell all or any part of its assets to another corporation organized under the banking laws of this State or of the United States, provided such other corporation assumes in writing, all of the liabilities of said corporation as shown by its records, other than its liabilities to its stockholders as such."

On April 30, 1932, with the consent of the State Auditor, the boards of directors of both banks adopted an agreement whereby the New Bank assumed substantially all of the Old Bank's deposit and other liabilities. In consideration therefor, the Old Bank turned over to the New Bank all of the former's cash and government obligations, and, in addition, the Old Bank tendered an unsecured obligation in the form of an account payable for the balance. All of the Old Bank's other assets were retained by it until selected by the New Bank for conveyance to it as provided for by section 7 (a) (3) of the agreement which read in part as follows:

"The New Bank may from time to time go through all loans [in the Old Bank's portfolio] * * * and may select such items as are, in the sole judgment of the New Bank, of the class that the New Bank would make or purchase in the usual course of its business, and the face value of all such loans * * *, plus accrued interest or less discount for prepaid interest unearned thereon, so selected shall be applied as a credit upon the liabilities assumed."

This agreement was to be of five years duration. In that period, all cash realized by the Old Bank was to be transferred to the New Bank with the former's indebtedness being reduced accordingly. The Old Bank guaranteed that on April 30, 1937, the New Bank would have received at least as much from the sale or liquidation of the Old Bank's assets as the liabilities assumed by the New Bank, or else the Old Bank and its stockholders would be responsible for paying the balance in full. By consent of the parties and with the approval of the State Auditor, this agreement subsequently was extended for an additional three years to April 30, 1940.

The result of this agreement was twofold. First, the New Bank remained solvent and it continues to operate today. During the 1930's, the New Bank's loan and investment portfolio contained only those of the Old Bank's assets which the New Bank's directors considered to be of value. Consequently substantially all losses resulting from the de-

preciation in value of loans and securities held by the Old Bank on April 29, 1932, were absorbed by that bank. Second, the separation of the two entities became more formal than substantial. During the Old Bank's liquidation period, the two banks functioned as a single banking operation. For example, all employees, officers and directors were paid by the New Bank although they performed in dual capacities as needed. The same premises housed both banks.

During the 1930's, the Pullman Company continued to inject funds into the combined operation. As a condition of the New Bank's opening after the National Bank Holiday in March, 1933, the State Auditor required the Pullman Company to deposit an additional $1,000,000 in the New Bank. In return therefor, the company took deferred and subrogated deposit certificates. The following year, with the permission of the State Auditor, the company withdrew about $458,000 of this deposit and placed it in the Old Bank in return for which the State Auditor rescinded his order that the Old Bank liquidate certain reduced-value assets on what the Pullman Company apparently believed to be a temporarily depressed market. This deposit in the Old Bank became subrogated to the New Bank's claim against the Old Bank's assets.

In April, 1940, the Old Bank owed the Pullman Company this $458,000 and nearly $136,000 in interest thereon, and it also owed the New Bank more than $880,000 in addition. To facilitate the final dissolution of the Old Bank—the State Auditor indicated that he would consent to no further extension of the liquidation period—the Pullman Company purchased all of the Old Bank's assets remaining after the New Bank had selected those which it considered to be of value. In return, the Pullman Company forgave the Old Bank its debt to the company, assumed the bank's debt to the New Bank, and paid $5,000.00 in cash to permit the Old Bank to pay a liquidating distribution of $1 per share. The Old Bank dissolved pursuant to a resolution of its shareholders at their final meeting in September, 1940.

2. Mimeograph 6209

Mimeograph 6209, 1947–2 Cum.Bull. 26, authorizes banks which elect to use the reserve method for determining their permissible bad debt deductions for federal income tax purposes to utilize their historic bad debt loss experience as a factor in that determination. Specifically, the Mimeo provides the following:

"1. The Bureau has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the proper measure of such reserves, and amounts to be allowed as deductions.

"2. In determining a reasonable annual addition to a reserve for bad debts by a bank it is believed to be fair and sufficiently accurate to resort to the average annual bad-debt loss of the bank over a period of twenty years, to include the taxable year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. * * * However, such reserve cannot be permitted to accumulate indefinitely simply because of the possibility that at some future date large losses may be concentrated within a relatively short period of time and operate to absorb the greatest probable reserve. To permit this would sanction the deduction of a mere contingency for losses, which is not an allowable deduction for income or excess-profits tax purposes. This latter rule makes imperative the imposition of some reasonable ceiling on the accumulation of the reserve other than such indefinite limitation as might eventually prevail under a moving-average method.

"3. The Bureau has accordingly approved the use by banks of a moving average experience factor for the de-

termination of the ratio of losses to outstanding loans for taxable years beginning after December 31, 1946. Such a moving average is to be determined on a basis of twenty years, including the taxable year, as representing a sufficiently long period of a bank's experience as to constitute a reasonable cycle of good and bad years. The percentage so obtained, applied to loans outstanding at the close of the taxable year determines the amount of permissible reserve in the case of a bank changing to the reserve method in such year * * * and the minimum reserve which the taxpayer will be entitled to maintain in future years * * *.[1] A bank following a change to the reserve method of accounting for bad debts, may continue to take deductions from taxable income equal to the current moving average percentage of actual bad debts times the outstanding loans at the close of the year, or an amount sufficient to bring the reserve at the close of the year to the minimum mentioned above, whichever is greater. Such continued deductions will be allowed only in such amounts as will bring the accumulated total at the close of any taxable year to a total not exceeding three times the moving average loss rate applied to outstanding loans * * *.

"4. In computing the moving average percentage of actual bad debt losses to loans, the average should be computed on loans comparable in their nature and risk involved to those outstanding at the close of the current taxable year involved. Government insured loans should be eliminated from prior year accounts in computing percentages of past losses, also from the current year loans in computing allowable deductions for additions to the reserve. Losses not in the nature of bad debts resulting from ordinary conduct of the present business should also be eliminated in computing percentages of prior losses.

"5. A newly organized bank or a bank without sufficient years experience of computing an average as provided for above, will be permitted to set up a reserve commensurate with the average experience of other similar banks with respect to the same type of loans, preferably in the same locality, subject to adjustment after a period of years when the bank's own experience is established.

* * * * * *

"8. The term 'banks' as used herein means banks or trust companies incorporated and doing business under the laws of the United States * * *, of any State, or of any territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts."

Up to and including 1947, plaintiff used the specific charge-off method for the reporting of bad debts. From 1948 to date, plaintiff has, with the Commissioner's permission, utilized the reserve method for so reporting, and it has used Mimeo 6209 in the calculation thereof.

Mimeo 6209 provides for the use of a moving twenty year average loss experience, the twenty years to include the taxable year. In 1954 the Service supplemented the Mimeo and authorized electing banks to utilize an average experience factor based on any twenty consecutive years after 1927. Rev.Rul. 54–148, 1954–1 Cum.Bull. 60. Plaintiff chose to use the period 1928–47, and it calculated its loss factor by determining

---

1. Electing banks are not precluded, however, from adding to their reserve an amount less than the maximum addition authorized by the Mimeo. Rev.Rul. 59–83, 1959–1 Cum.Bull. 52 (a ruling which applies retroactively).

the Old Bank's experience for 1928–31,[2] the experience of the combined operation for 1932–40, and the New Bank's experience for 1941–47. The Commissioner does not object to plaintiff's choice of years, to the use of the substituted experience of the Old Bank prior to the New Bank's existence, nor, of course, to plaintiff's use of its own experience for 1941–47. But the Commissioner contends that for 1932–40, when plaintiff was in existence, it must use solely its own experience.

In 1954, the Service also authorized electing banks to compute their loss experience factor in either of two ways: by averaging the sums of their annual loss experience for each of the twenty relevant years, or by using that "average" which is the dividend of the sum of the annual bad debt losses for each of the twenty years divided by the sum of the annual year-end loan bases for each of those same years. Rev.Rul. 54–597, 1954–2 Cum.Bull. 90. Plaintiff chose to use the former method to which defendant does not object.

### 3. Application of Mimeograph 6209 to this Case

The ninety day statutory notice of deficiency received by plaintiff and appended to the complaint bases the Commissioner's disallowance of any additions to plaintiff's reserve for bad debts in 1955 and 1956 on the ground that a proper calculation of plaintiff's loss experience factor reveals that the bank's then present reserve was in excess of the ceiling permitted by the Mimeo. Defendant now contends that notwithstanding the correctness of plaintiff's bad debt experience factor computed under Mimeo 6209, the Commissioner's determination that any addition to the bank's bad debt reserve in those years would be unreasonable is itself presumptively a proper determination and the taxpayer has the burden, in order to rebut this presumption, of showing that the Commissioner abused his discretion in so concluding.

Mimeo 6209 and rulings supplementary thereto were promulgated under the authority of what is now section 166(c) of the Internal Revenue Code, Title 26, U.S.C. That section provides:

"In lieu of any [bad debt deduction for wholly, or, in certain cases, partially worthless debts] there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts."

At least three times in the past several years, the Tax Court has considered whether Mimeo 6209 itself constitutes the full extent of the Commissioner's exercise of discretion under section 166(c), i. e., whether any addition to a bad debt reserve up to and including the amount sanctioned by the Mimeo is conclusively presumed to be valid, or whether a computation under the Mimeo is subject to further review with respect to its reasonableness. That court, however, has provided inconsistent answers.

In Boardwalk Nat'l Bank of Atlantic City, 34 T.C. 937 (1960), acq., 1961–2 Cum.Bull. 4, the Tax Court stated the following (34 T.C. at 946):

"Respondent stresses that section 166, supra, gives him great latitude and discretion in determining the reasonableness of a reserve for bad debts * * *. The fallacy in applying this principle in the instant case, however, is that respondent *did* exercise his discretion under section 166, supra, by publishing a revenue ruling of general application granting an election. The ruling has not been revoked or repudiated. * * * * " (*Dictum*)

This seemed to dispose of the contrary holding in Miners Nat'l Bank of Wilkes-Barre, 33 T.C. 42 (1959). Just a few months ago, however, the court apparently reverted to its earlier decision that

---

2. Use of a substituted experience for that portion of the twenty years in which the electing bank was not in existence

is authorized by Rev.Rul. 57–350, 1957–2 Cum.Bull. 144 (which ruling applies retroactively).

the Mimeo 6209 figure is itself subject to review for reasonableness. Central Bank Co., 39 T.C. 856 (March 14, 1963).

On August 7, 1963, the following "Technical Information Release" (TIR 499) was published by the Service:

"In response to numerous inquiries about the recent Tax Court decision in Central Bank Company, 39 T.C. No. 90 [856] (on appeal to C.A.6th), Internal Revenue Service announced that the discretion specifically granted the Secretary or his delegate in section 166(c) of the Internal Revenue Code of 1954 to determine reasonable additions to a reserve for bad debts was exercised in the promulgation of Mimeograph 6209, C.B. 1947-2, 26, and Revenue Rulings supplementary thereto, and that it will continue to allow additions to bank bad debt reserves when the reserves are properly computed in accordance therewith."

■ If the position espoused by the Technical Information Release was not accepted by the Service and the courts, every bank which elects to use the reserve method and Mimeo 6209 would find that its calculation of its reserve for bad debts would be subject to annual review for reasonableness despite fastidious compliance with the Commissioner's directive with respect thereto. Such a result would be intolerable. The Court concludes that Mimeo 6209 is the product of the Commissioner's exercise of discretion as authorized by section 166(c) of the Internal Revenue Code and that a computation in accordance therewith is presumed to be reasonable. Accordingly, the defendant would have the burden of disproving its reasonableness.

■■ Even if plaintiff has the burden of proving unreasonableness and arbitrariness on the Commissioner's part, it has met that burden. Mr. Paul R. Wilkinson, who for the past 39 years has either been a bank executive officer or an examiner in the State Auditor's office, testified that in his opinion the additions to its bad debt reserve which plaintiff sought to make in 1955 and 1956 were reasonable and that the Commissioner's refusal to allow these (or any) additions was unreasonable. He based this opinion on (1) his own experience, (2) the facts presented in a four page hypothetical question which supposed a history, capitalization, balance sheet and bad debt experience similar to plaintiff's and (3) his best judgment as to the near future risks run by banks. This opinion is entitled to considerable weight.

Defendant argues that if plaintiff never suffered more bad debts annually than it did in the years 1955 and 1956, its reserve at year-end 1956, without additions, would probably not be exhausted for decades. Defendant forgets that a reserve is designed, as Mimeo 6209 clearly recognizes, to provide for possible bad years as well as good ones. Thus if plaintiff had sustained, in 1957, the bad debt losses which the Old Bank suffered in 1931—about 2% of its loan base—plaintiff's reserve which defendant calls reasonable would have been more than eliminated. Bad debt losses in 1957 such as the Old Bank sustained in 1934, more than 10% of its loan base, would exhaust many times over plaintiff's reserve which defendant claims was sufficient. Neither plaintiff, defendant nor the Court knows whether, in a given time period, a particular bank's bad debt losses will be more or less than they are at present. A reserve, however, is intended to provide for any reasonably probable contingency. A sharp rise in bank bad debt losses is such a contingency.

Under the circumstances, plaintiff must be deemed to have met the burden of rebutting the reasonableness of the Commissioner's determination. Cf. American State Bank v. United States, 279 F.2d 585 (7th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960).

At the trial of this cause, defendant's counsel, in urging the right of the Commissioner to review a computation under Mimeo 6209, questioned the wisdom of the Mimeo's formula. Apparently the Commissioner was persuaded that banks

are especially vulnerable to bunching of bad debt losses, that such bunched losses tend to occur in years of banks' lowest income and that such an institution's bad debt experience over a rather long (twenty years) as well as dramatic (including the depression) period bears some relation to that bank's likely bad debt experience in the future. He apparently also concluded that while banks should be protected in the event of an economic downturn they should not be allowed to create a mere contingency reserve. The twenty year loss experience factor limited by the ceiling provision is his compromise solution.

It is not for the Court to decide whether banks are entitled to a special method of computing reserves, and a resultant tax benefit, not accorded to other taxpayers. The Mimeo has never been withdrawn. It applies generally to all banks. Accordingly, plaintiff is entitled to its benefits.

### 4. Mimeograph 6209 Computation

■ The parties are in dispute with respect to certain principles to be used in computing plaintiff's loss experience factor. First, they disagree as to whether, for the years 1932–40, the relevant bad debt experience is that of the New Bank only or that of the New Bank combined with that of the Old Bank. The Court concludes that Mimeo 6209 requires use of the latter method.

As already stated, the two banks represented in fact a single and continuous banking operation. This finding is supported by such evidence as the identity of location, employees, officers and directors; the role of the Pullman Company in each bank; the banks' use of section 12 of the Illinois Banking Act with the intent that, when the depression dust cleared, a solvent Pullman Bank would remain; and the form and implementation of the 1932 agreement extended in 1937. The different books, the technical separation of the corporate entities, the separate audits, and the somewhat divergent list of shareholders reflect more form than substance.

Furthermore, the reserve envisioned by Mimeo 6209 is one which is the product of good and bad years. But the New Bank's years of *least* bad debt losses were the depression years when it held only the cream of the Old Bank's portfolio. In fact, plaintiff's loss experience in 1956, concededly a low loss year, was as high or higher than the loss experience sustained by the New Bank alone during any year while the Old Bank was in liquidation. Plaintiff's use of the Old Bank's loss experience during the latter's period of liquidation does not constitute, as defendant contends, utilization of a substituted loss experience; rather it merely recognizes that plaintiff once consisted of two parts both of which combined to comprise the whole.

Next, the parties disagree as to whether a write-down of an account constitutes a bad debt loss within the meaning of the Mimeo. Plaintiff concedes that some items appearing in its calculation of the Old Bank's net charge-offs for 1930 and 1931 were mere write-downs.

■■ Ordinarily, to be deductible a debt must clearly be worthless. Cf. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200 (1934); Loewi & Co. v. Commissioner, 232 F.2d 621 (7th Cir. 1956). No reason has been advanced as to why the rule should be otherwise under Mimeo 6209. Accordingly, the Court concludes that such write-downs do not constitute bad debt losses.

■ Third, plaintiff seeks to include in the Old Bank's bad debt losses for 1932 certain accounts which the State Auditor ordered the Old Bank to write off in that year as worthless but with which order the bank failed to comply. The Old Bank did not report such losses on its 1932 federal income tax return.

While the Auditor's order is entitled to some weight in establishing when, thirty years ago, these losses occurred, it should not be accorded conclusive weight thereon. The Court holds that these accounts did not become worthless for purposes of Mimeo 6209 until they

were written off the bank's books. Cf. Hadley Falls Trust Co. v. United States, 110 F.2d 887, 893 (1st Cir. 1940).

The parties should be able, within this framework, to calculate plaintiff's loan base without further assistance from the Court and shall endeavor between themselves to resolve any differences which may remain as to the amount of any refund to which plaintiff is entitled. They shall refer to the Court only those questions on which they are unable to reach an accord. Within thirty days, they shall report to the Court on their progress toward such resolution.