NORTH CAROLINA NATIONAL BANK
v.
The UNITED STATES.
No. 451–60.

United States Court of Claims.
May 14, 1965.

Gordon W. Gerber, Philadelphia, Pa., for plaintiff. Kenneth W. Gemmill and Dechert, Price & Rhoads, Philadelphia, Pa., of counsel.

Thomas A. Troyer, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner, and Earl L. Huntington, Washington, D. C., were on the briefs.

Before LARAMORE, DURFEE, and DAVIS, Judges, and JONES * and WHITAKER, Senior Judges.

WHITAKER, Senior Judge.

Plaintiff sues to recover the additional taxes assessed against it resulting from the disallowance of the addition to its reserve for bad debts claimed on its return.

Plaintiff succeeded to all the rights and obligations of the Security National Bank of Greensboro on June 30, 1960. The Security Bank had been organized on August 28, 1933. Until 1951 the Security Bank was engaged in the making of commercial loans only, but in that year it organized a Time Payment Department, which it continued to operate during and after the taxable years in question, which are the years 1953, 1954, and 1955.

The business of the Time Payment Department consisted of the making of loans payable in installments over periods, normally, of from 24 to 36 months and secured frequently by liens or chattel mortgages on automobiles, household appliances, etc. It also purchased from automobile dealers and dealers in household appliances notes taken by such dealers from their customers, which were secured by liens on the appliances and, when purchased by the bank, were also secured by the endorsement of the dealer. It also made house improvement loans, payable in installments.

When the bank determined to enter the time-payment-loan field, it employed a person to manage this department who had not been previously connected with the bank and who was familiar with this type of loans. The manager organized a group of persons experienced in this field to handle this department of the bank's business. Separate books of accounts were kept for this department, and separate balance sheets and profit and loss statements were prepared. No employee of the Commercial Department had anything to do with the business of the Time Payment Department, and vice versa.

Plaintiff's experience and that of others engaged in this type of business

* At the time this case was argued, March 4, 1964, Jones, Senior Judge, was Chief Judge of the court. The decision here-in has been deferred pending decision in the Central Bank Co. and Pullman Trust & Savings Bank cases cited infra.

showed that losses from bad debts were substantially greater than such losses on the commercial type of loans.

Beginning with the year 1947 the bank, with the consent of the Commissioner of Internal Revenue, began to avail itself of the provisions of section 166(c) of the Internal Revenue Code of 1954 in computing its deduction for bad debts.[1] This section permitted, in the discretion of the Secretary of the Treasury or his delegate, the deduction of a reasonable addition to a reserve for bad debts.

When taxpayer came to compute its addition to its reserve for the years 1953, 1954, and 1955, it computed a reasonable addition to its reserve for bad debts on account of the loans in the Time Payment Department separately from an addition on account of the loans in the Commercial Department, and it claimed a deduction for the sum of the two.

The Commissioner of Internal Revenue made a computation to determine what addition the bank was entitled to on the basis only of its experience in the commercial loan field, supplemented by the experience of other banks similarly situated, and did not take into consideration the bank's experience, or the experience of other banks similarly situated, in the time-payment field. Since the bank's reserve for bad debts thus computed already exceeded the maximum, he disallowed any addition to the reserve. However, if it is proper to compute the addition on loans in the Time Payment Department separately from the Commercial Department and add the two together, then the reserve did not exceed the limit for 1954 and 1955, but it did for 1953, and plaintiff would have been entitled to an addition thereto for 1954 and 1955.

Plaintiff says it filed its returns in compliance with the provisions of Mimeograph 6209, 1947–2 Cum.Bull. 26, issued by the Commissioner of Internal Revenue, with the approval of the Secretary

of the Treasury, and, since that is so, the Burden is on the Commissioner of Internal Revenue to show that the provisions of this mimeograph should not be used in this particular case. The Commissioner, on the other hand, says that he computed the reserve in accordance with this mimeograph, except that he did not compute the reserve on loans in the Time Payment Department separately from loans in the Commercial Department, and that he had the discretion to do so or not as he saw fit. This is the issue which the case presents.

Section 166 of the Internal Revenue Code of 1954 permits the deduction, as a general rule, of debts that become worthless within the taxable year, but in subsection (c) it permits, in lieu thereof, "a deduction for a reasonable addition to a reserve for bad debts"; but a taxpayer was only entitled to use the latter method within "the discretion of the Secretary or his delegate." Undoubtedly, the Commissioner of Internal Revenue and the Secretary of the Treasury had the discretion to allow or not to allow a deduction of an addition to a reserve for bad debts. The taxpayer as a matter of right could deduct all debts that became worthless within the taxable year, but it could only deduct an addition to a reserve for bad debts within the discretion of the Commissioner.

This alternate method was allowed after the Revenue Act of 1943, but it was not until 1947 that the Commissioner of Internal Revenue promulgated any rulings to inform banks as to when they might be permitted to deduct an addition to their reserve for bad debts and how this reserve should be computed. In Mimeograph 6209, dated December 8, 1947, the Commissioner of Internal Revenue, with the approval of the Acting Secretary of the Treasury, stated in paragraph 1: *"The Bureau has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the*

---

1. Section 23(k) (1) of the Internal Revenue Code of 1939, as amended by section 113(a) of the Revenue Act of 1943,

58 Stat. 21, contains substantially the same provisions as set out above.

proper measure of such reserves, and the amounts to be allowed as deductions." (Emphasis added.) In paragraph 2 it was stated: "In determining a reasonable annual addition to a reserve for bad debts by a bank *it is believed to be fair and sufficiently accurate* to resort to the average annual bad-debt loss of the bank over a period of twenty years, to include the taxable year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. * * * " (Emphasis added.)

The other relevant provisions of the mimeograph will be referred to later. What has been quoted so far is only for the purpose of showing that after "careful and extended consideration," the Commissioner adopted a plan which he "believed to be fair and sufficiently accurate."

This mimeograph, although signed by the Commissioner and approved by the Secretary of the Treasury, still has not the force and effect of a regulation, but we are of opinion that it was issued as the exercise of the discretion reposed in the Secretary of the Treasury and his delegate by section 166(c) of the Revenue Act of 1954 and the comparable provisions of the Revenue Act of 1939, and that banks are entitled to the benefit of its provisions.

Again, on April 8, 1954, nearly seven years after the issuance of Mimeograph 6209, the Commissioner of Internal Revenue, with the approval of the Acting Secretary of the Treasury, issued Rev. Rul. 54–148, 1954–1 Cum.Bull. 60, which set forth an alternative method of computing the addition to the reserve. But in that ruling it was said, "Banks which are now using the moving average method provided in Mimeograph 6209 may continue to use that method if they so desire, * * *." Thus, after Mimeograph 6209 had been in existence for nearly seven years, it was reaffirmed by this ruling.

Since this mimeograph and the later ruling do not have the binding effect of a regulation, we think that, in extraordinary or unusual circumstances, the Commissioner might refuse to permit use of the mimeograph, but in the absence of such conditions, we think a bank is entitled to an addition to its reserve according to its provisions, and the Commissioner of Internal Revenue may not deny its use, unless he shows that unusual or extraordinary circumstances in the particular case make its use improper.

There has been much confusion in prior decisions of the courts over this question, but the most recent decisions are in accord. In Pullman Trust and Savings Bank v. United States, 235 F.Supp. 317 (D.C., 1963), opinion by Judge Will, the burden was squarely placed on the Commissioner of Internal Revenue to show why Mimeograph 6209 should not be applied to the case at hand. The Court of Appeals for the Seventh Circuit, in a *per curiam* opinion, 338 F.2d 666 (1964), affirmed the decision of the District Court and adopted its opinion as its own.

Judge Will's opinion carefully reviewed prior opinions in the Tax Court and other courts. He stated that the Tax Court in Miners National Bank of Wilkes-Barre, 33 T.C. 42 (1959), had held that the Commissioner was not bound by Mimeograph 6209 and, despite its provisions, could allow or disallow an addition to a reserve in his discretion. On the contrary, it was held in Boardwalk National Bank of Atlantic City, 34 T.C. 937 (1960), that the Commissioner of Internal Revenue and the Secretary of the Treasury had already exercised their discretion when they issued Mimeograph 6209 and that the Commissioner of Internal Revenue was bound by it. Then still later the Tax Court in 1963 had held in Central Bank Company, 39 T.C. 856, that the Commissioner had the discretion to disregard Mimeograph 6209.

Judge Will then quoted what was called Technical Information Release (TIR 499), published by the Internal Revenue

Service on August 7, 1963, which reads as follows:

"In response to numerous inquiries about the recent Tax Court decision in Central Bank Company, 39 T.C. No. 90 [856] (on appeal to C.A.6th), Internal Revenue Service announced that the discretion specifically granted the Secretary or his delegate in section 166(c) of the Internal Revenue Code of 1954 to determine reasonable additions to a reserve for bad debts was exercised in the promulgation of Mimeograph 6209, C.B. 1947–2, 26, and Revenue Rulings supplementary thereto, and that it will continue to allow additions to bank bad debt reserves when the reserves are properly computed in accordance therewith." [235 F.Supp. 317, 323.]

■ Judge Will concluded his opinion on this phase of the case as follows:

"If the position espoused by the Technical Information Release was not accepted by the Service and the courts, every bank which elects to use the reserve method and Mimeo 6209 would find that its calculation of its reserve for bad debts would be subject to annual review for reasonableness despite fastidious compliance with the Commissioner's directive with respect thereto. Such a result would be intolerable. The Court concludes that Mimeo 6209 is the product of the Commissioner's exercise of discretion as authorized by section 166(c) of the Internal Revenue Code and that a computation in accordance therewith is presumed to be reasonable. Accordingly, the defendant would have the burden of disproving its reasonableness." [235 F.Supp. 317, 323.]

As stated above, this opinion was adopted by the Court of Appeals as its own.

The Tax Court's determination in the Central Bank Company case, supra, was appealed to the Court of Appeals for the Sixth Circuit. In a *per curiam* opinion, the Tax Court was reversed. In its opinion the Court of Appeals said:

"Presumably to indicate how the Commissioner's discretion would be exercised in relation to the problem related above, on December 8, 1947, George J. Schoeneman, then Commissioner of Internal Revenue, published Mimeograph Bulletin 6209, the first sentence of which reads as follows:

" '1. The Bureau has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the proper measure of such reserves, and amounts to be allowed as deductions.' " [329 F.2d 581 (1964).]

It also said that while the case was pending before it, the Commissioner of Internal Revenue issued Rev.Rul. 63–267, 1963–2 Cum.Bull. 99, which it quoted as follows:

"In connection with the implementation of section 166(c) of the Code with respect to banks, there is set forth in Mimeograph 6209, C.B. 1947–2, 26, and Revenue Rulings supplementary thereto, guidelines for computing a reasonable addition to a reserve for bad debts. The Service will continue to allow additions to bank bad debt reserves when the additions are determined by the Commissioner to be properly computed in accordance with the formula set forth in the foregoing publications." [329 F.2d 581, 582.]

It then said that [at p. 583]: "In view of this action, counsel for respondent Commissioner changed his position in a Supplemental Brief and at oral argument; and, abandoning reliance on his first argument, urged affirmance solely on the second ground of his contention before the Tax Court, namely, that the taxpayer bank had not properly applied the provisions of Mim. 6209." The case was therefore remanded to the Tax Court for its decision on the second ground advanced by the Commissioner, which had not been decided in its former

opinion, since it had disposed of the case on the ground that the Commissioner had the discretion to disregard Mimeograph 6209.

The decision in the Pullman case is in apparent conflict with American State Bank v. United States, 279 F.2d 585 (7 Cir. 1960), cert. denied, 364 U.S. 881, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960), decided by the same court, but not necessarily so, since in that case the court, after quoting Mimeograph 6209, said:

> "The real controversy arises because the Commissioner disallowed deductions from income tax to the extent that these deductions for the reserve account for bad debts were based upon *substituted* loss ratio for the years the Bank was in actual existence. * * *" (Emphasis added.) [279 F.2d 585, 587.]

No one would deny that the Commissioner had the discretion to disallow an addition computed in a way unauthorized by the mimeograph or as the result of a misapplication of its provisions. We also agree with the court that:

> "[S]lavish adherence to a formula might, under certain conditions, result in an unreasonable addition to a bad debt reserve, or a failure to make any addition * * *." [279 F.2d 585, 589.]

But we do say that Mimeograph 6209 is to be applied in the absence of unusual or extraordinary circumstances, and that the burden is on the defendant to show that the circumstances are unusual or extraordinary.

The District Court for the Northern District of Ohio, in an exhaustive and well-reasoned opinion by Battisti, District Judge, in Union National Bank of Youngstown v. United States, 237 F.Supp. 753 (1965), held that "Mimeograph 6209 is an expression of the Commissioner's discretion" and, following Pullman Trust and Savings Bank v. United States, supra, it said:

> "Hopefully, the Pullman Trust case laid the issue to rest by concluding that a computation in accordance

with mimeograph 6209 is presumed reasonable, and the burden of disproving its reasonableness rests upon the Commissioner. For the Court to have found otherwise would return banks to their pre-1947 position when calculations of their bad debt reserves subjected banks to annual reviews for reasonableness despite complete compliance with the Internal Revenue Service's directions.

> "Therefore, this Court concludes that mimeograph 6209 is the Commissioner's exercise of the discretion authorized by Section 166(c) of the Code; and that although the mimeograph does not have the force and effect of law, it is a rule of general application binding on the Commissioner, and binding on the taxpayer as well by way of rebuttable presumption. * * *" [237 F.Supp. 753, 761.]

So, it would seem that our opinion, that the burden is on the defendant to show that Mimeograph 6209 should not be applied in any particular case, is in accord with both the Seventh Circuit and the Sixth Circuit, and that defendant itself admits that it is controlling, and, indeed, purported to use it in the case at bar.

Nor do we think that the opinion we have expressed is in conflict with our prior decision in Paramount Finance Co. v. United States, 304 F.2d 460, 157 Ct. Cl. 824 (1962). Mimeograph 6209 was not involved in that case; instead, plaintiff relied upon an agreement between it and the Commissioner of Internal Revenue. Mimeograph 6209 was not mentioned since it applied only to "banks," and in paragraph 8 of the mimeograph it is provided that the term "banks" means "banks or trust companies incorporated under the laws of the United States, of any State or of any Territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts." The Paramount Finance Company does not appear to be such an institution.

Also our decision in the Paramount Finance Company case was issued prior to Rev.Rul. 63–267, quoted by the Court of Appeals in the Central Bank Company case, supra, and also prior to the Technical Information Release published by the Service on August 7, 1963; so that even if the Paramount Finance Company had been a bank, our decision might have been different in the light of these rulings.

Mimeograph 6209 provides for the computation of an addition to a bad debt reserve by taking "a moving average of losses to outstanding loans over a period of twenty years, including the taxable year," and for applying the percentage to the loans outstanding at the end of the taxable year. This is to be continued year by year, dropping the first year in the former period and including always the taxable year. In paragraph 5 it is provided that a bank without twenty years' experience "will be permitted to set up a reserve commensurate with the average experience of other similar banks with respect to the same type of loans, preferably in the same locality, subject to adjustment after a period of years when the bank's own experience is established."

Plaintiff bank and its predecessor were not in existence over a period of twenty years and, to supply the missing years, it adopted the experience of the banks in the Fifth Federal Reserve District, in which plaintiff bank was situated, in computing its reserve on its commercial business. The Commissioner of Internal Revenue makes no objection thereto.

Rev.Rul. 54–148, supplementing Mimeograph 6209, provided in section 4, paragraph .01, "In lieu of the moving average experience factor provided in paragraph 3 of Mimeograph 6209, which is determined on a basis of 20 years including the taxable year, a bank may use an average experience factor based on any 20 consecutive years of its own experience after the year 1927." And if a bank was not in existence throughout the twenty-year period it selected, it was permitted to fill in such years with the experience of other banks in the same locality with respect to the same type of loans.

Plaintiff bank availed itself of the provisions of Rev.Rul. 54–148 and selected the years 1928 to 1947, inclusive, during a part of which period it was not in existence, and so it borrowed the experience of banks in the Fifth Federal Reserve District to fill in the years in which it was not in existence in computing its reserve on its commercial loans. The Commissioner of Internal Revenue does not question this.

As stated, plaintiff computed its addition to its reserve on the loans in the Commercial Department separately from its loans in the Time Payment Department. It bases its right to do this on the provisions of paragraphs 4 and 5 of Mimeograph 6209 and also on the provisions of section 4, paragraph .03, of Rev. Rul. 54–148. In paragraph 4 of Mimeograph 6209 it is provided that "in computing the moving average percentage of actual bad debt losses to loans, the average should be computed *on loans comparable in their nature and risk involved to those outstanding at the close of the current taxable year involved.*" (Emphasis added.) Also, in paragraph 5 providing for the borrowing of the experience of other banks, it limits the banks to those with experience "with respect to the same type of loans." Paragraph .03 of section 4 of Rev.Rul. 54–148 also speaks of borrowing the experience of similar banks "with respect to the same type of loans."

It would be manifestly unfair in arriving at the "moving average" to include in the outstanding loans in previous years Government secured loans (the example used in the mimeograph), because, presumably, there were no bad debt losses on such loans. By the same token, it would be unfair to apply a "moving average," computed on loans on which the bad debt losses were small, to loans on which the losses were much larger.

The bank's own comparative bad debt experience on its commercial loans and on its time-payment loans, as set out in Finding 13, shows a loss ratio on com-

mercial loans of 0.0106 percent and on time-payment loans of 0.0766 percent— more than seven times as much. This is equally as unfair as the inclusion of Government secured loans, and it is not in accord with the provisions of Mimeograph 6209 and Rev.Rul. 54–148, which provide the exclusion of loans not comparable and for borrowing the experience of other banks "with respect to the same type of loans."

Since the average for prior years used by the Revenue agent in auditing plaintiff's returns was computed only on commercial loans, it cannot be applied to time-payment loans, because they are not at all comparable. Some other basis for comparison must be found.

The trial commissioner offers four alternative bases for comparison. One is the banks in the Fifth Federal Reserve District; second, the Bank of Georgia; third, the Bank of Delaware, and fourth, the Banks of Georgia and Delaware combined. We cannot use the banks in the Fifth Federal Reserve District as a basis for comparison since the evidence does not show how these banks computed the ratio to be applied. But, presumably, it was based primarily on commercial loans, since banks generally did not enter the time-payment-loan field until 1945.

The Bank of Georgia furnishes perhaps the best basis for comparison, except for the fact that we are reluctant to use only one bank as a basis for comparison. The Bank of Delaware offers some basis for comparison, but not quite so good as the Bank of Georgia because further removed geographically and perhaps operating under somewhat different economic conditions. Both the Bank of Georgia and the Bank of Delaware had been engaged in so-called consumer loans, as distinguished from commercial loans, for many years. Both of them were outgrowths of a Morris Plan Bank, but the evidence does not specify the exact type of loans other than as consumer loans.

If we use the Bank of Georgia as a basis for comparison, we arrive at a factor for 1953 of 0.2355 percent and for 1954 and 1955 of 0.598 percent. (The big difference between the factors for the two periods is due to the fact that in 1953 the factor was computed on the basis of the experience for the prior twenty years, including the taxable year, whereas for 1954 and 1955 it was computed upon the basis of any twenty years after 1927 selected by the taxpayer, which, of course, included the years of the Great Depression.)

If we use the Bank of Delaware as a basis for comparison, we arrive at a factor of 0.7065 percent for 1953 and 1.1185 percent for 1954 and 1955. It will be noted that the bad debt experience of the Bank of Delaware was considerably worse than that of the Bank of Georgia.

If we compare the experience of the Bank of Georgia on its consumer loans with all the banks in the Fifth Federal Reserve District on all types of loans, we find that for the year 1953 the factor for the banks in the Fifth Federal Reserve District was 0.3 percent, whereas the factor for the Bank of Georgia was only 0.2355 percent. For 1954 and 1955 the factor for the banks in the Fifth Federal Reserve District was 0.7 percent, whereas the factor for the Bank of Georgia was 0.598 percent.

So, if we use the experience of either the Bank of Georgia or the banks in the Fifth Federal Reserve District, our error will not be great. Since the two figures are so close, we have less reluctance to use the experience of only one bank in computing the reserve on the time-payment loans. We have decided to use the experience of the Bank of Georgia as a basis for comparison, rather than the banks in the Fifth Federal Reserve District, because of the very definite provisions of Mimeograph 6209 and Rev.Rul. 54–148 requiring that there be taken into consideration in applying the ratio "the same type of loans" only.

We are aware that the method of computing the addition to the reserve, as outlined above, may be cumbersome and ill-adapted to the bookkeeping system of some banks, but it cannot be avoided in this case as long as this bank's experi-

**552**

ence and the experience of the other banks in the Fifth Federal Reserve District in the time-payment field encompasses less than twenty years. As soon as this length of experience of either or both has been reached, it may be that an average of bad debt losses on the aggregate of all loans of all types could be computed and this average applied to the outstanding loans, both commercial and time-payment, at the end of the taxable year. But the average for the twenty-year period computed only on loans with a low bad debt experience, cannot be applied to loans of a high bad debt experience—and this is the situation with which we are faced in this case.

The plaintiff is entitled to recover in accordance with the foregoing opinion, and the case is remanded to the trial commissioner for further proceedings pursuant to Rule 47(c).