**FIRST AMERICAN NATIONAL BANK OF NASHVILLE**

v.

**UNITED STATES of America.**

**Civ. A. No. 4744.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Feb. 16, 1971.

William Waller, Nashville, Tenn., for plaintiff.

Charles H. Anderson, U. S. Atty., Nashville, Tenn., Stanley F. Krysa, Tax Division, Civil Dept., Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM

MORTON, District Judge.

This action was instituted by the plaintiff to recover certain taxes and interest for the calendar years 1961, 1962 and 1963.

The plaintiff, First American National Bank of Nashville, is a national banking corporation with its principal office in Nashville, Tennessee. It filed its corporate income tax returns for the calendar years 1961, 1962 and 1963 with the

District Director of the Internal Revenue of Nashville, Tennessee. Upon examination of these returns by the Internal Revenue Service, certain adjustments were made resulting in deficiency assessments. These assessments were duly paid, claims for refund were filed, and upon the disallowance by the Commissioner of the Internal Revenue, this suit was filed.

The questions presented are:

(1) Whether interest collected by the plaintiff bank as owner of municipal bonds subject to repurchase agreements, when at the option of the plaintiff seller will repurchase the bonds, is includable in plaintiff's taxable income or is entitled to the exclusion as interest received by the bank on tax-free bonds.

(2) Whether expenditures made from certain construction performed on plaintiff's building housing its banking facilities are deductible as an ordinary business expense as incidental repairs thereto.

(3) Whether loans involving no risk of loss such as those secured by holdback or reserve accounts are eligible for inclusion in the loan base in computing the allowable deductions for additions to plaintiff's bad debt reserve.

## QUESTION NO. 1

■ During the years in question the bond dealers who had been the successful bidders for municipal bonds, arranged for the bank to advance the money for the payment thereof and said bonds were delivered to the bank with the written repurchase agreements on which the dealers agreed to repurchase said bonds upon demand of the bank at the same price. During the same period involved some dealers who were successful bidders made an arrangement with the bank whereby the bank would advance the funds for the bonds with an oral agreement that the successful bidder would later pay for the bonds and accept delivery from the bank. The transactions were in effect similar in substance to those described in the opinion of the

Court in the case of American National Bank of Austin v. United States of America, 421 F.2d 442 (5th Cir., 1970).

During the years involved customers of the bank who had agreed to purchase bonds from dealers requested the bank to purchase the bonds itself with the oral understanding that the customer would later purchase the bonds from the bank at the same price, with appropriate adjustment for accrued interest. These transactions were similar in substance to those described in the aforementioned *American National Bank of Austin* case.

During the years in question the bank purchased bonds from bond dealers and later sold these bonds to trust accounts for which the bank was acting as trustee through its Trust Department. Prior to such purchases there was discussion between the Bond Department and the Trust Department of the bank, in which the officer of the Trust Department made it known that the bonds in question were, in his opinion, suitable for trust accounts and that the Trust Department would like to acquire some of the bonds for such trust accounts as and when funds were available. In most cases it was not known at the time of the purchase of the bonds to what trust accounts particular bonds would be allocated. However, in some cases a particular lot of bonds were earmarked for a particular trust account, to be transferred to this trust account when it had funds available, as, for example, when other bonds matured and were paid. The trusts which purchased the bonds would not have sufficient funds at the time of the purchase of the bonds by the bank to acquire the bonds, and in the interim the bank kept the bonds in its regular investment account. When the trust accounts acquired the necessary funds, they were transferred to the bank and the bonds were transferred to the trust account. The trust accounts paid the bank the cost of the bonds plus accrued interest.

Looking at the last instance first, it appears to the Court that there is no material difference in the substance of the trust account acting for an estate mak-

ing the arrangement with the plaintiff bank and the substance of a living customer making said same arrangement.

Looking at the substance of the transactions involved in each of these above mentioned instances, it appears that the coupon interest collected by the bank functioned as interest to the bond dealer customers, either individual or fiduciary. The bank insured itself from any loss of principal by having the option to require the bond dealers and its individual customers to repurchase said bonds at the original sales price, i. e., the price paid by the bank when the purchase was made and likewise had as security the bonds themselves. Insofar as the bank's relationship with its own Trust Department, certainly it would be unrealistic to assume that the bank, having purchased the bonds for the Trust Department, could not require its own Trust Department to accept the same without a loss that would affect the general assets of the bank. The material fact is that the bank had the ability in these transactions to insulate itself from any loss and at the same time had possession of the bonds as security.

We feel that these questions are settled and foreclosed by the holding in the case of Union Planters National Bank of Memphis v. United States, 426 F.2d 115 (6th Cir., 1970) in which case it adopted the rationale of the case of American National Bank of Austin v. United States, *supra.*

Thus it is the holding of this Court that the taxpayer has failed to establish that it is entitled to treat the income received by it in the form of interest collected on municipal bonds as exempt from taxation, the plaintiff's "ownership" thereof being without substance.

The Government concedes that any interest received by the plaintiff as a member of a successful bidding syndicate is exempt. An appropriate provision for the refund thereof shall be made in the judgment entered in this case.

## QUESTION NO. 2

By virtue of certain construction performed on taxpayer's building housing its banking facilities, taxpayer expended in 1961 the sum of $402,755.58 and in 1962 the sum of $50,584.57. A portion of these expenditures were admittedly capital investment and a portion is claimed to be deductible as an ordinary business expense as incidental repairs.

The architect responsible for the construction determined that "certain percentages" of the various contracts constituted repairs and on this basis they were deducted by the taxpayer.

The architect was employed to draw up the plans and specifications and supervise the work of filling in, by construction of usable space, a court and do certain remodeling and renovation of the building. Each month during the progress of the work the architect would examine the invoices for payment submitted by the contractor and would separate what appeared to be for new construction in the court area and what was used "for repairs and renovation of the old part of the building." In examining the invoices, the architect, being familiar with the construction, in making his allocation would "just come up with just an arbitrary type of a figure." Some of the construction in the old or existing portion of the building consisted of removing walls, building some new walls, tearing out worn out floors and replacing them with concrete, replacing a portion of the plumbing and electrical wiring, removing light fixtures and replacing with modern fixtures (a portion of which were relocated), and enlarging some of the offices. The taxpayer had previously rented to members of the public a portion of its building. As a result of this remodeling, it occupied a portion previously occupied by persons other than bank personnel.

On the occasion of the testimony of the architect, he had destroyed his computations and stated he could not now,

by examining the invoices, determine a percentage of the total allocable to repairs. He stated that the expenditures did arrest the deterioration of the building. He further stated:

"Q In order for them to make these offices surrounding the core suitable for the purposes for which they were going to use them for—I guess they were now going to take over these offices, whereas before they were rented to other tenants.

"A That's right.

"Q They would have to make these expenditures?

"A That's right. But it didn't add anything to the floor area or the value of the building except as they were using it.

"Q Well, that's all we're interested in. It prolonged the suitability of the building for their purposes?

"A Only." (Deposition, Victor Nielsen, taken December 7, 1970.)

Treasury Regulation 1.162–4 is as follows:

"§ 1.162–3. *Repairs*.—The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept."

No question is raised as to the reasonableness of the regulation. In actual fact this regulation has been in effect since 1958 and has official acceptance beyond recall.

Generally speaking, only those expenditures which are made for the purpose of keeping property in ordinary efficient operating condition and which do not add to its value or prolong its life are classified as being for repairs and thus deductible. Expenditures made as a part of a general plan of modernization and improvement generally must be capitalized. United States v. Wehrli, 400 F.2d 686 (10th Cir. 1968); Hubble v. Kavanagh, 48 A.F.T.R. 1359 (E.D. Mich., 1954), affirmed *per curiam* 220 F.2d 753 (6th Cir. 1954).

It is likely that some expenditures made by the taxpayer may have been for the purpose of keeping its property in ordinary efficient operating condition. However, from this record such does not appear. The person who made the allocation defined it as a percentage "an arbitrary type of a figure." He lost his computations and the taxpayer apparently entered on its books a sum which was the result of the use of "an arbitrary type of a figure." Although the invoices for the total construction cost of $402,755.58 for the year 1961 and $50,584.57 for the year 1962 are available, the person who made said allocation can now produce no evidence justifying his allocation of $122,551.98 for 1961 and $34,388.18 for 1962 as a repair expense.

This Court does not understand that an arbitrary percentage allocation is the proper method of accounting for tax or business purposes.

The Court finds that the taxpayer has failed to overcome the presumption of correctness of the Commissioner's determination. Manos v. Commissioner of Internal Revenue, 187 F.2d 734 (6th Cir. 1951).

Accordingly, on this question the Government must prevail.

## QUESTION NO. 3

For the taxable years 1961 and 1962 the Internal Revenue Service disallowed as deductions certain additions to the bad debt reserve of the taxpayer who had elected to be governed by the Inter-

nal Revenue Code of 1954, Section 166, subsection (c). For the years in question the plaintiff computed its deduction for bad debts by using as its loan base the total of its loans outstanding for the year less government-insured loans. The Internal Revenue determined that the loan base should be reduced by three reserve and/or holdback accounts which had the effect of reducing the plaintiff's allowable bad debt reduction.

The reserve accounts in question are referred to as Finance Holdback, dealer's Finance Reserve, and Finance Insurance Reserve.

Finance Holdback reserve consists of a retention by the plaintiff bank of a small percentage of the net proceeds to the dealer as a reserve to cover possible losses on loan paper purchased by the bank from said such dealers who are regular customers of the bank.

Finance Reserve accounts arise by reason of the bank withholding from the dealer that portion of the finance charges which are allocated to the dealer, said amounts being withheld as an additional protection to the bank against losses.

Finance Insurance Reserve arises when the plaintiff handles financing paper in an automobile transaction on which the plaintiff acquires automobile insurance from a broker and adds the cost thereof to the automobile purchaser's notes. The insurance commission is divided equally between the bank and the dealer. If the person prepays the notes he would be entitled to a refund of a proportionate amount of the insurance commission. To cover this refund the plaintiff holds back into reserve that portion of the insurance commission due the dealer by reason of the split of the commission. (Any additional refund for unearned insurance premium would be paid by the insurance company.)

It is admitted that the above accounts represent no risk of loss to the bank and that they do not represent funds paid out by the bank. These accounts are designed to offset any losses the bank may have incurred in the event the com-

mercial paper becomes uncollectible or in the event the insurance is canceled and the apportionate insurance commission must be refunded. It is of interest to note that the reserves are held by the bank and are not treated as income, prepaid or unearned.

The pertinent provisions of the Internal Revenue Code of 1954 are:

"SEC. 166. *BAD DEBTS.*

"(a) *General Rule.*

"(1) *Wholly worthless debts.*— There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

"(2) *Partially worthless debts.*— When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

\* \* \* \* \* \*

"(c) *Reserve for Bad Debts.*—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

\* \* \* \* \* \*

"SEC. 7805. *RULES AND REGULATIONS.*

"(a) *Authorization.*—Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

"(b) *Retroactivity of Regulations or Rulings.*—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

"(c) *Preparation and Distribution of Regulations, Forms, Stamps, and Other Matters.*—The Secretary or his delegate shall prepare and distribute all the instructions, regulations, directions, forms, blanks, stamps, and other matters pertaining to the assessment and collection of internal revenue." (26 U.S.C.)

As expressed by District Judge Wells [Pullman Trust & Savings Bank v. United States, 235 F.Supp. 317 (N.D.Ill. 1963)], the Commissioner of Internal Revenue recognized that banks are subject to large bad debt losses during economic recessions. Thus the Commissioner, under the authority of § 166(c), *supra,* issued Mimeograph 6209.

Sections 1, 2 and 4 of Mimeograph 6209 are:

"1. The Bureau has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the proper measure of such reserves, and amounts to be allowed as deductions.

"2. In determining a reasonable annual addition to a reserve for bad debts by a bank it is believed to be fair and sufficiently accurate to resort to the average annual bad-debt loss of the bank over a period of twenty years, to include the taxable year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. * * * However, such reserve cannot be permitted to accumulate indefinitely simply because of the possibility that at some future date large losses may be concentrated within a relatively short period of time and operate to absorb the greatest probable reserve. To permit this would sanction the deduction of a mere contingency for losses, which is not an allowable deduction for income or excess-profits tax purposes. This latter rule makes imperative the imposition of some reasonable ceiling on the accumulation of the reserve other than such indefinite limitation as might eventually prevail under a moving-average method.

\* \* \* \* \* \*

"4. In computing the moving average percentage of actual bad debt losses to loans, the average should be computed on loans comparable in their nature and risk involved to those outstanding at the close of the current taxable year involved. Government insured loans should be eliminated from prior year accounts in computing percentages of past losses, also from the current year loans in computing allowable deductions for additions to the reserve. Losses not in the nature of bad debts resulting from ordinary conduct of the present business should also be eliminated in computing percentages of prior losses."

In 1957 the Commissioner issued Revenue Ruling 57–210 which deals with the application of Section 4 of Mimeo 6209. In this ruling the Commissioner stated as to the elimination of government insured loans from the computation of the "moving average" that

" * * * it has been the practice of the Service to consider that eliminations are required only of government insured or guaranteed loans which are 100 percent insured or guaranteed and not to loans which are government insured or guaranteed to some extent but less than 100 percent."

Thereafter, the ruling provided that to the extent of such insurance, all government insured loans should be eliminated.

However, involving specifically the authority of Section 7805(b), *supra,* the Commissioner made such ruling prospective only.

In 1963 by Revenue Ruling 63–122 the Commissioner stated:

"Section 166(c) of the Internal Revenue Code of 1954 allows a deduction for a reasonable addition to a reserve for bad debts.

"Mimeograph 6209, as supplemented by Revenue Ruling 54–148, sets forth methods of computing annual additions to bad debt reserves by banks. Mimeograph 6209 indicates that only loans in which an element of risk is present should be considered by a bank in computing additions to bad debt reserves under these methods. Further, an addition to a bad debt reserve may not be based on an item which has never been included in income. See Wilbur Glenn Voliva v. Commissioner, 36 F.2d 212 ([7 Cir.], 1929), Ct.D. 162, C.B. IX–1, 301 (1930).

"In the instant case, the 'hold back' accounts are clearly in the nature of guarantee deposits left with the bank by the dealers to protect the bank from any loss on the paper. Therefore, it is concluded that, to the extent of such guarantee deposits, the bank has no risk in the paper.

"In view of the foregoing, it is held that for the purpose of computing reasonable annual additions to its reserve for bad debts under Mimeograph 6209 and Revenue Ruling 54–148, *supra,* a bank is required to decrease the face amount of installment paper outstanding by (1) the amount of the 'hold back' account and (2) the amount of any discount which has not yet been realized and reported in gross income for Federal income tax purposes."

Ruling 63–267 was generally to the same effect. It is to be noted that the Commissioner did not limit such interpretation to future computations, the effect being that the interpretation related back.

In 1968 the Commission issued Revenue Ruling 68–630 which, in addition to other matters, had the effect of eliminating from the computation of the "moving average" loans secured by collateral such as passbooks, certificates of deposit, etc. Exercising his authority under Section 7805(b), the Commissioner

elected to make said ruling as to its application prospective in effect.[1]

The taxpayer contends that (1) for the years involved it complied with the literal wording of Mimeograph 6209; (2) the single exclusion in 6209 of "government insured loans" is exclusive and permits no interpretation; (3) Revenue Rulings 63–122 and 63–267 were modifications of the Commissioner's position and thus could not be applied retroactively.

The Court is aware of the holdings in the cases of North Carolina National Bank v. United States, 345 F.2d 544, 170 Ct.Cl. 765; The Central Bank Company v. Commissioner of Internal Revenue 329 F.2d 581 (6th Cir. 1964); Pullman Trust & Savings Bank v. United States 338 F.2d 666 (7th Cir. 1964) (adopted opinion in 235 F.Supp. 317, N.D.Ill., 1963) and agrees with the reasoning therein applied.

However, the question in the instant case is whether the wording of Mimeograph 6209 is subject to the interpretation placed thereon by the taxpayer.

Initially, looking at the substance of the transaction, it appears that to the extent of the "hold back" reserves, the bank never really advanced the funds; that each loan had a face amount as reflected on the face of the note or loan instrument. However, the amount actually "outstanding" was the amount actually advanced by the bank and which it had at risk in the hands of a borrower. To hold otherwise would open the door to as many schemes as the mind of man could imagine. An analogous circumstance is that of a construction loan. The bank issues a letter of commitment (usually contingent). Later a note is executed but no money advanced. Still later, as the construction progresses, the funds are advanced in proportion to the percentage of construction. Keeping in mind that we are not here concerned with the law of contracts or obligations to make loans, at what stage is there an

1. Passbook (savings) accounts and certificates of deposit are generally issued in a

specific name and the issuing bank does not have complete control over same.

unconditional and outstanding loan and in what amount?

Basically as an accounting and business principle, there can be no bad debt if there is no risk of loss. Furthermore, an addition to a bad debt reserve may not be based on an item which has never been included in income. Voliva v. Commissioner of Internal Revenue, 36 F.2d 212 (7th Cir. 1929).

In the Mimeograph 6209 such expressions were used:

"To permit this would sanction the deduction of a mere contingency for losses, which is not an allowable deduction for income or excess profits tax purposes." (Section 2)

" * * * and risk involved to those outstanding * * *." (Section 4)

"Losses not in the nature of bad debts resulting from ordinary conduct of the present business * * *." (Section 4)

Admitting for the purpose of argument that the Commissioner has established as a binding principle that banks are entitled to a special method of computing reserves and a resultant tax benefit, can the Court conclude that in so doing he eliminated the application of accepted principles of accounting and business? We think not.

The implication from the language of Mimeograph 6209 is that risk loans as distinguished from paper loans were to be used to establish the "moving average" or loan base for bad debt deduction. In view of the entire mimeograph (6209) the Court concludes that the exclusion of "government insured loans" is not exclusive. Nor is the Commissioner precluded from its definition of "loans outstanding."

Assuming that by Rev.Rul. 63–122 and 63–267 there was a material change in the interpretation of the Commissioner, can it be contended that he did not have the authority to make same retroactive to the prior open tax years? We think not. Section 7805(b) specifically gives him this authority. In the absence of abuse of discretion (no evidence appears

in this record of abuse), the courts are reluctant to interfere with the exercise of the discretion of the Commissioner.

In the case of Commissioner of Internal Revenue v. South Texas Lumber Company, 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948), the Court said:

"This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons." (Citing authority.)

Of particular importance is the language of the United States Supreme Court in the case of Automobile Club of Michigan v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746, (1957) wherein the Court stated as follows:

"The Commissioner's action may not be disturbed unless, in the circumstances of this case, the Commissioner abused the discretion vested in him by § 3791(b) of the 1939 Code. That section provides:

" 'RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary, or the Commissioner with the approval of the Secretary, may prescribe the extent, if any, to which any ruling, regulation or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect.'

"The petitioner contends that this section forbids the Commissioner taking retroactive action. On the contrary, it is clear from the language of the section and its legislative history that Congress thereby confirmed the authority of the Commissioner to correct any ruling, regulation or Treasury decision retroactively, but empowered him, in his discretion, to limit retrotive application to the extent necessary to avoid inequitable results."

For the reasons stated, the taxpayer must, as to Question No. 3, fail.

The attorneys for the Government will draw an appropriate order, submit the same to the attorney for the plaintiff for approval, and file the same with the Clerk of the Court. This order shall be filed with the Clerk within fifteen (15) days from the date of entry of this Memorandum.