THE FIRST NATIONAL BANK OF CHICAGO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3408-72.    Filed September 3, 1975.

*William P. Sutter* and *Donna Rankin,* for the petitioner.
*Seymour I. Sherman,* for the respondent.

FAY, *Judge:* Respondent determined a deficiency of $419,253.17 in the Federal income tax of petitioner, the First National Bank of Chicago, for the year 1968. Certain concessions having been made, it remains for us to decide if respondent properly disallowed a portion of the deduction claimed by petitioner for an addition to its reserve for bad debts. Sec. 166(c), I.R.C. 1954.[1]

### FINDINGS OF FACT

Many of the facts pertinent to this case have been stipulated and are so found.

Petitioner is a national banking association. It filed a U.S. corporation income tax return for the year in issue with the District Director of Internal Revenue, Chicago, Ill. Petitioner's principal place of business was in that same city when the petition herein was filed.

Petitioner serves as the trustee for numerous individual trust and similar accounts. In accordance with regulations issued by the comptroller of the currency, petitioner conducts and accounts for this aspect of its business apart from the others, through its trust department.[2]

The trust department maintains an account ledger for each trust which includes: an income account which reflects the amount of cash held for the income beneficiary of the trust; a principal account which reflects the amount of cash held for the principal beneficiary; and a securities account which reflects the purchases and sales of all kinds of securities held by the trust, in units rather than dollars.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

[2] 12 C.F.R. secs. 9.8 and 9.13 (1974):

Sec. 9.8 Books and accounts.

(a) Every national bank exercising * * * fiduciary powers shall keep its fiduciary records separate and distinct from other records of the bank. * * * The fiduciary records shall contain full information relative to each account.
* * *

Sec. 9.13 Custody of Investments.

(a) The investments of each [fiduciary] account shall be kept separate from the assets of the bank, * * *

(b) The investments of each [fiduciary] account shall be either:

(1) Kept separate from those of all other accounts * * * or

(2) Adequately identified as the property of the relevant account. [28 F.R. 3309, Apr. 5, 1963, as amended at 37 F.R. 24161, Nov. 15, 1972].

From time to time, petitioner's trust department makes cash payments on behalf of the trusts which it administers. Each of these payments is chargeable to either the income or the principal account of the trust on behalf of which it is made. When the account to be charged contains insufficient cash to cover a payment, a negative balance called an overdraft results. A transaction that will result in an overdraft will be authorized by a trust officer only when ultimate restoration of the overdraft is reasonably certain. Sources from which repayment is typically anticipated are: periodic returns on trust investments such as dividends and interest; proceeds realized on the liquidation of the trust's investments in securities; additional contributions to the trust by the donor; and funds on deposits with petitioner in existing savings and checking accounts, provided authorization for the release of such funds is obtained from the customer in whose name the account is maintained.

No note is ever executed to evidence an overdraft; neither is a maturity date fixed nor interest charged. Losses incurred by petitioner on overdrafts have been minimal.

When a cash payment is made in an amount which exceeds the balance in the income or principal account to be charged, the additional funds needed to cover the payment are obtained by petitioner's trust department from its commercial loan department through the following device. Each day, the trust department summarizes by trust, the principal and income overdrafts that were outstanding at the close of the preceding working day. If the summaries disclose that on a particular day there was a net increase in overdrafts outstanding over the prior day, the trust department requests a cash advance in the amount of the net increase from the commercial loan department. Such an advance is called a trust department advance (TDA). TDA's are entered on petitioner's books as loans receivable and on the books of the trust department as liabilities. If a daily summary indicates that there has been a net decrease in overdrafts outstanding, the TDA account is commensurately reduced.

Since 1921 petitioner has claimed deductions for bad debts by maintaining a bad debt reserve and by taking deductions for additions to the reserve annually under section 166(c). For the years 1947 through 1964 additions to the reserve were computed by petitioner in accordance with the provisions of Mim. 6209, 1947-2 C.B. 26. Additions for subsequent years including the year in

issue were computed under the uniform reserve ratio method provided for in sections 3 through 6 of Rev. Rul. 65-92, 1965-1 C.B. 112.

In making computations under Mim. 6209 and Rev. Rul. 65-92, petitioner has always included the balance in its TDA account in its loan base. On December 31, 1968, the outstanding balance in the account was $19,136,794.50.

Statutory notice of the deficiency at issue herein was mailed on March 9, 1972.

OPINION

Section 166(a) provides that in computing taxable income, a taxpayer may claim deductions for debts which became worthless during the taxable year and, under certain circumstances, for debts which are recoverable only in part and are charged off within the taxable year. Section 166(c) provides that in lieu of any deductions allowable under section 166(a), the taxpayer will, at his option, be allowed a deduction for a reasonable addition to a reserve for bad debts.

The use of the reserve method for deducting bad debts is subject to the reasonable discretion of the Commissioner of Internal Revenue. Sec. 166(c). In an exercise of this discretion he issued Mim. 6209, 1947-2 C.B. 26, on December 8, 1947. Mim. 6209 provided as follows at pages 26-27:

1. The Bureau [now the Internal Revenue Service] has given careful and extended consideration to the situation of banks in general with respect to the use of reserves for bad debts, the proper measure of such reserves, and amounts to be allowed as deductions.

2. In determining a reasonable annual addition to a reserve for bad debt by a bank it is believed to be fair and sufficiently accurate to resort to the average annual bad-debt loss of the bank over a period of 20 years, to include the taxable year, as constituting a representative period in the bank's history and to accept the equivalent percentage of presently outstanding loans as indicative of the probable annual accruing loss. * * *

3. The Bureau has accordingly approved the use by banks of a moving average experience factor for the determination of the ratio of losses to outstanding loans for taxable years beginning after December 31, 1946. Such a moving average is to be determined on a basis of 20 years, including the taxable year, as representing a sufficiently long period of a bank's experience to constitute a reasonable cycle of good and bad years. The percentage so obtained, applied to loans outstanding at the close of the taxable year, determines the amount of the permissible reserve in the case of a bank changing to the reserve method in such year * * * and the minimum reserve which the taxpayer will be entitled to

maintain in future years * * *. A bank, following a change to the reserve method of accounting for bad debts, may continue to take deductions from taxable income equal to the current moving average percentage of actual bad debts times the outstanding loans at the close of the year, or an amount sufficient to bring the reserve at the close of the year to the minimum mentioned above, whichever is greater. Such continued deductions will be allowed only in such amounts as will bring the accumulated total at the close of any taxable year to a total not exceeding three times the moving average loss rate applied to outstanding loans * * * [3]

While Mim. 6209 was in effect, additions to reserves for bad debts computed in accordance with its provisions were presumed to be reasonable. The Commissioner might have disallowed deductions claimed for such addition only if he could demonstrate that application of Mim. 6209 was inappropriate in a particular case due to unusual or extraordinary circumstances. *Pullman Trust & Savings Bank v. United States*, 235 F. Supp. 317, 323 (N.D. Ill. 1963), affd. per curiam 338 F.2d 666 (7th Cir. 1964); *North Carolina National Bank v. United States*, 345 F.2d 544, 549 (Ct. Cl. 1965). Mim. 6209 was proved wanting when applied; for it resulted in an unwarranted variance among the reserves of banks which utilized it. See Rev. Rul. 65-92, 1965-1 C.B. 112, 113. Therefore on March 15, 1965, the Commissioner issued Rev. Rul. 65-92 which superseded Mim. 6209. At pages 113-114 of 1965-1 C.B., Rev. Rul. 65-92 provides:

Sec. 3. * * *
* * * a bank will be allowed deductions for additions to its reserve for bad debts until the reserve equals 2.4 percent of loans outstanding at the close of the taxable year * * *
* * *
Sec. 6. * * *
* * * the addition to the reserve * * * shall not [however] exceed an amount equal to 0.8 percent of loans outstanding at the end of the taxable year, or an amount sufficient to bring the reserve to 0.8 percent of loans outstanding at the end of the taxable year, whichever amount is greater.

This method of computing additions to reserve for bad debts is commonly referred to as the uniform reserve ratio method.[4]

---

[3] On Apr. 8, 1954, the Commissioner issued Rev. Rul. 54-148, 1954-1 C.B. 60, which provided that in computing a reasonable addition to its reserve for bad debts, a bank might use an average experience factor based on any consecutive 20-year period after 1927.

[4] Guidelines published in Rev. Rul. 66-26, 1966-1 C.B. 41, as to the proper application of the uniform reserve ratio method do not concern us here. Nor do modifications of that method introduced in Rev. Rul. 68-524, 1968-2 C.B. 83. Nor are we concerned with the alternate method of computing annual additions to bad debt reserves provided for in Rev. Rul. 65-92.

Petitioner elected to compute the additions which it made to its bad debt reserve for 1968 under the uniform reserve ratio method. The Commissioner has conceded that petitioner was entitled to utilize the method. Therefore if petitioner's computations prove to have complied with the method, petitioner will be allowed the deduction which it claimed for 1968 under section 166(c). *Pullman Trust & Savings Bank v. United States, supra; North Carolina National Bank v. United States, supra.* At issue is whether the computations did in fact meet the requirements of the uniform reserve ratio method.

Petitioner included in the loan base on which the addition was computed, the balance in its TDA account on December 31, 1968. The Commissioner contends that the balance ought not to have been included in the loan base.

In support of this contention, the Commissioner first argues that the TDA's were not loans, pointing out that they were made by petitioner's commercial loan department to its trust department; that none of the TDA's was evidenced by a note or had a fixed maturity date; that interest was neither provided for nor paid; and that petitioner never demanded nor sought to enforce repayment.

A loan is the delivery of a sum of money, either to or on behalf of a party who agrees, expressly or impliedly and without condition, to restore at some time in the reasonably proximate future, an amount of money equivalent to the sum delivered. *First Trust & Savings Bank of Davenport, Iowa v. United States,* 301 F. Supp. 194, 197 (S.D. Iowa 1969). The record herein discloses that the balance in petitioner's TDA account represented cash payments actually made by petitioner through its trust department on behalf of trusts which the said department administered. Each payment was made with the expectation that petitioner would be reimbursed. In our opinion, the record admits of no other conclusion but that the balance in petitioner's TDA account represented outstanding loans which petitioner made to the trusts administered by its trust department.[5]

---

[5] Regulations issued by the comptroller of the currency and found at 12 C.F.R. sec. 9.12(f), provide:

(f) A national bank may make a loan to [a fiduciary] account and may take as security therefore assets of the account, provided such transaction is fair to such account and is not prohibited by local law. [28 F.R. 3309, Apr. 5, 1963, as amended at 37 F.R. 24161, Nov. 15, 1972].

Although the balance in the TDA account represents outstanding loans, this does not insure that it qualifies for inclusion in the loan base on which annual additions to petitioner's bad debt reserves may be computed. Several principles relevant to the eligibility of loans for inclusion have been developed in Mim. 6209 and several of its progeny. See *First American National Bank of Nashville v. United States*, 327 F. Supp. 675, 682 (M.D. Tenn. 1971), affd. 467 F.2d 1098 (6th Cir. 1972).

On November 19, 1968, the Commissioner issued Rev. Rul. 68-630, 1968-2 C.B. 84, in order—

to clarify certain questions regarding the eligibility of items for inclusion in the loan base by banks using the uniform reserve ratio method of computing annual additions to reserves for bad debts.

### Section 9 of the ruling provides at page 87:

A bank may compute the addition to its reserve for bad debts on the basis of loans outstanding at the close of its taxable year, except that any loan outstanding on such date that is not representative of the bank's ordinary portfolio of outstanding customer loans must be excluded from the loan base. * * *

The Commissioner argues that if the TDA's are loans, they are excluded from petitioner's loan base under section 9.

In our opinion, section 9 must be interpreted in the context of the two sections of the ruling which precede it.

### Section 7 provides at page 86:

the special methods of determining allowable deductions for additions to reserves for bad debts of banks can only be justified in the context of normal customer loan activities of banks. These methods may not appropriately be applied to the trading or investment aspects of a bank's financial activities. Accordingly, the special reserve methods of accounting for bad debts in the case of banks do not apply to securities.

### Section 8 provides at page 87:

Money market obligations * * * are acquired * * * by banks as part of the continual process of maintaining and adjusting their liquidity position. In this context, money market obligations, like debt securities, are functionally related to the trading or investment position of banks rather than the lending position of banks.

Accordingly it is held that banks * * * must exclude from the loan base * * * the following money market obligations:

(1) "Sales" or "loans" of Federal funds * * *

(2) "Commercial paper" * * * One example of [which] is short-term promissory notes * * * that may be purchased on the open market.

Sections 7 and 8 distinguish between trading and investment on the one hand, and the lending aspects of a bank's activities on the other. In issuing Rev. Rul. 68-630 it was the Commissioner's purpose to exclude from the loan base obligations acquired by the bank for trading or investment purposes. Sections 7 and 8 give effect to this purpose in respect of the several specific kinds of obligations enumerated in those sections. Section 9 is a broadly phrased rule of exclusion based upon the principle that underlies the two preceding sections. The cash payments represented by petitioner's TDA account are plainly in the nature of customer loans rather than of debt securities or money market obligations. They therefore ought not to be excluded from petitioner's loan base under section 9.

Pursuant to Mim. 6209, the Commissioner issued Rev. Rul. 63-122, 1963-2 C.B. 98. Another of the principles relating to the composition of the loan base, since incorporated into Rev. Rul. 68-630, was stated as follows in Rev. Rul. 63-122, *supra* at 98-99:

only loans in which an element of risk is present should be considered by a bank in computing additions to bad debt reserves * * *

In the past petitioner has sustained minimal losses on TDA's. The Commissioner argues that the TDA's must therefore be excluded from the loan base as entailing no risk. In respect of this argument we shall first consider the decision of the United States District Court for the Southern District of Iowa in *First Trust & Savings Bank of Davenport, Iowa v. United States, supra.* In that case the plaintiff bank financed customers who wished to build homes by having them execute a first mortgage and mortgage note. When the mortgage had been recorded and its status as a first lien established, the bank would credit the proceeds of the loan to a special account in the customer's name. Disbursements were then made from the account upon order of the customer.

The bank computed annual additions to its bad debt reserve in accordance with Mim. 6209. For the purpose of computing those additions it included in its loan base amounts which had been credited to special borrower accounts, even if they had not as yet been disbursed.

In previous years the bank had suffered no losses on loans of this kind. The Commissioner therefore argued that they should have been excluded from the loan base as entailing no risk. Notwithstanding the record of prior years, the court resolved the

controversy in favor of the bank. It rested its decision on the fact that once the loans were approved and the proceeds credited to the special accounts, the funds were available for immediate disbursement on the order of the buyer.

In *Akron National Bank & Trust Co. v. United States*, 510 F.2d 1157 (6th Cir. 1975), the plaintiff bank financed construction projects by requiring the customer to execute a note and mortgage once the loan had been approved. The proceeds of the loan were then credited to a special account. Respecting the disposition of the funds in the special account the loan agreement provided:

[The] proceeds of the loan * * * shall be drawn upon through vouchers in form agreeable to Bank and signed vouchers shall be made payable to subcontractors, contractors and materialmen only, and shall be paid by Bank but only after the services and/or materials for which they have been given have been actually installed or completed. In the event such materials or services are defective, Bank may refuse payment therefor until defects therein are corrected. Bank may elect to pay sums to owner, or upon his order from time to time, other than as set forth above but it has no duty to do so. * * * [*Akron National Bank & Trust Co. v. United States,* an unreported case (N.D. Ohio 1973, 32 AFTR 2d 73-6091, 73-6092; 73-2 USTC par. 9780).]

The loan agreement further provided that in the event:

(b) There is any breach of any of the terms or conditions of this agreement or of the mortgage deed or the promissory note * * *;
* * *
(g) Borrower is adjudged bankrupt, suffers the appointment of a receiver, files a petition under Chapter XI of the Bankruptcy Act, or
(h) Borrower requests a termination of the loan or confesses inability to continue construction,

Then, Bank may immediately and without notice declare the loan * * * to be in default, [and] apply all sums remaining in * * * [the] special account to the principal amount of the mortgage indebtedness * * *

The bank computed the annual additions to its bad debt reserve in accordance with the uniform reserve ratio method. In so doing, it included in the loan base the full amount of the construction loans which it had made. The Commissioner took the position that the proceeds of the construction loans could not be included in the loan base while they remained in the special accounts. The court agreed.

The court rested its decision on the fact that the borrower did not have complete control of the funds in the special account established for him. In any one of several circumstances, the bank

could have applied the funds in the special account to reduce the principal amount of the indebtedness. In reaching its decision, the court distinguished *First Trust & Savings Bank of Davenport, Iowa v. United States, supra,* wherein the proceeds of the loan were completely within the control of the borrower once they were credited to his special account.

On the authority of these decisions we hold that a loan entails an element of risk and is not reasonably excluded from the loan base when the lending bank advances funds without having under its control cash items or balances which it can apply immediately to reduce the amount of the outstanding indebtedness. See *First American National Bank of Nashville v. United States, supra* at 681. Our holding is wholly consistent with Rev. Rul. 68-630, *supra,* which provides at page 85 that loans must be excluded from the loan base when the:

lending bank has rights in specific cash items or cash balances under its control such as when a lending bank receives collateral in the nature of cash on deposit in the lending bank that is represented by a passbook, certificate of deposit, or other similar instrument.

An outstanding loan * * * is not affected by the fact that a borrower is required, by virtue of an arrangement with the lending bank, to maintain a minimum, average, or compensating balance in a demand deposit account within the lending bank while the loan is outstanding. An overdraft in one or more deposit accounts of a customer is an outstanding loan eligible for inclusion in the loan base whether or not other deposit accounts of the same customer have balances in excess of the overdraft.

The record discloses that petitioner made cash disbursements on behalf of the trusts which it administered only when responsible officers were satisfied that reimbursement would be forthcoming. Petitioner did not, however, have at its disposal cash items out of which it could reimburse itself unilaterally. The funds which it disbursed on behalf of the trusts were therefore placed at risk.

We therefore hold that petitioner properly included in its loan base for the purpose of applying Rev. Rul. 65-92, the outstanding balance in its TDA account as of December 31, 1968.

*Decision will be entered under Rule 155.*