The FIRST NATIONAL BANK OF CHICAGO, Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVE-NUE, Respondent-Appellant.

No. 76–1284.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1976.

Decided Dec. 17, 1976.

Rehearing and Rehearing En Banc Denied Jan. 31, 1977.

Scott P. Crampton, Asst. Atty. Gen., Michael L. Paup, Atty., Tax Division, Dept. of Justice, Meade Whitaker, Washington, D. C., for respondent-appellant.

William A. Cromartie, William P. Sutter, Chicago, Ill., for petitioner-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and WOLLENBERG, Senior District Judge.*

PER CURIAM.

In the taxable year 1968, taxpayer First National Bank of Chicago included $19,136,-794.50 of advances to its Trust Department in its loan base for computing its bad debt deduction. Judge Fay of the Tax Court upheld this method and therefore decided that taxpayer had overpaid its income tax by $85,622.12. The Commissioner appealed. We reverse.

As part of its operation, taxpayer maintains a Trust Department and keeps a separate set of books for that department. The Trust Department maintains an income account, a principal account and a securities account for each trust it administers. In making cash disbursements on behalf of trusts, there is sometimes insufficient cash in a particular trust account to cover the disbursements.[1] The appropriate Trust Department officer will then authorize an overdraft when reasonably certain that the advance will be repaid.[2]

When a trust officer authorizes an overdraft, it appears in the individual trust account as a negative or credit figure. The Trust Department daily summarizes the total of all negative balances in individual trust accounts. If the overdrafts show a net increase from the preceding day, taxpayer's Commercial Loan Department advances the amount of that increase to the Trust Department. Such an advance is called a Trust Department Advance (TDA). Taxpayer carries the TDA account on its books as a loan to the Trust Department. The Trust Department books show the TDA account as a liability to taxpayer.

Section 166(c) of the Internal Revenue Code (26 U.S.C. § 166(c)) permits "a reasonable addition to a reserve for bad debts" to be deducted as a bad debt in the discretion of the Commissioner.[3] Pursuant to Revenue Ruling 65–92, 1965–1 Cum.Bull. 112, taxpayer computed this deduction under a uniform reserve ratio method which normally allows a bank to deduct additions to its bad debt reserve until the reserve equals 2.4 per cent of the loans outstanding at the

---

* Senior District Judge Albert C. Wollenberg of the Northern District of California is sitting by designation.

1. According to the parties' stipulation of facts, overdrafts occur for the following reasons (Stip. at 6–7):

    "(a) Purchase of securities before receipt of the proceeds from a corresponding sale of securities or some other expected funds;

    "(b) Payment of taxes, including personal property taxes and estate taxes;

    "(c) Fixed income payments to the income beneficiary as provided in the trust agreement;

    "(d) Payment of necessary, and possibly unexpected and emergency, living expenses of the income beneficiary;

    "(e) Payment of legal fees for the trust incurred in probate proceedings and payment for other professional services, such as for preparation of a trust tax return, and

    "(f) Payments in distribution of the trust assets pursuant to a trust agreement before receipt of all liquidation proceeds."

2. Typical sources of repayment are: periodic payment of dividends and interest on trust investments; proceeds from the liquidation of trust investments; additional contributions to the trust by the settlor; funds on deposit with taxpayer in savings or checking accounts, provided that the customer authorizes the release of such funds. Stip. at 7–8, 15.

3. Section 166(c) provides:

    "*Reserve for bad debts.*—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate [the Commissioner]) a deduction for a reasonable addition to a reserve for bad debts." (26 U.S.C. § 166(c))

end of the taxable year. Taxpayer included the $19,136,794.50 in the TDA account in its loan base in making that computation. The Commissioner determined that this was impermissible on the ground that the TDAs were "not representative of the bank's ordinary portfolio of outstanding customer loans" as required by Section 9 of Revenue Ruling 68–630, 1968–2 Cum.Bull. 84.[4] Therefore, he disallowed taxpayer's bad debt deduction to the extent of $459,283.07.[5] However, the Tax Court held that the TDAs were "in the nature of customer loans" and therefore not within the exception of Section 9.[6] Consequently, the TDAs were deemed eligible for inclusion in taxpayer's loan base. *First National Bank of Chicago v. Commissioner of Internal Revenue*, 64 T.C. 1001 (1975).

As previously noted, under Section 166(c) of the Code, a bad debt deduction for a reasonable addition to a reserve for bad debts is only allowable in the discretion of the Commissioner. Therefore, as the Sixth Circuit observed in *Akron National Bank & Trust Co. v. United States*, 510 F.2d 1157, 1161 (6th Cir. 1975), in holding that funds undisbursed from construction loan "Due to Borrowers" accounts were not includable within the total of loans outstanding, the question under Section 166(c) and Revenue Ruling 68–630 is whether the Commissioner's view is reasonable rather than whether

the taxpayer's view is reasonable. The Court of Appeals in *Akron* accepted the Court of Claims' interpretation of Section 166(c) in *Paramount Finance Company v. United States*, 304 F.2d 460, 464, 157 Ct.Cl. 824 (1962), *viz.*, "It does not follow that if the plaintiff [taxpayer] was reasonable in its determination the defendant [Commissioner] was unreasonable." 510 F.2d at 1161. In *Paramount* Judge Laramore added, "the burden is on the plaintiff to show that the Commissioner was unreasonable, and absent this showing we will not assume that there has been an abuse of discretion."

Taxpayer does not assert that Section 9 of Revenue Ruling 68–630 is unreasonable *per se*. Instead, it first asserts that Section 9 does not constitute an independent basis for excluding non-representative loans from a bank's loan base but rather merely summarizes the "laundry list" of items to be excluded from the bank's loan base under Sections 3 through 8 of the Revenue Ruling. However, the terms of Section 9 lead to the opposite conclusion. The last sentence of Section 9 provides that a loan entered into for the purpose of enlarging the otherwise available bad debt deduction will be presumed not to be representative of the bank's ordinary portfolio of outstanding customer loans. There would be no need for such a provision in Section 9 unless it had an independent function.[7]

4. Section 9 of Revenue Ruling 68–630 provides:
"A bank may compute the addition to its reserve for bad debts on the basis of loans outstanding at the close of its taxable year, *except that any loan outstanding on such date that is not representative of the bank's ordinary portfolio of outstanding customer loans must be excluded from the loan base.* If a loan is entered into or acquired for the purpose (whether or not it is the primary purpose) of enlarging the otherwise available bad debt deduction, it will be presumed that the loan resulting from such transaction is not representative of the bank's ordinary portfolio of outstanding customer loans." (Emphasis supplied.)

5. This figure was arrived at by multiplying the TDA account of $19,136,794.50 by the uniform ratio of 2.4 percent.

6. The court below did not perceive Section 9 as an independent basis for excluding non-repre-

sentative loans from the bank's loan base. In Judge Fay's view, Section 9 simply underscored the distinction between customer loans and investment vehicles implicit in the earlier sections of the Revenue Ruling. See text *infra* at 5. Therefore, to be fully accurate, the Tax Court did not find the TDAs to be "in the nature of consumer loans" as a general proposition. Rather, only in a comparative context measuring TDAs against "consumer loans" vis-à-vis investment vehicles, did the court find TDAs to be "in the nature" of the former instead of the latter.

7. If the first sentence of Section 9 was no more than a broadly-phrased rule of exclusion relying on the principles expressed in Sections 3 through 8 to separate consumer loans from investment vehicles, the second sentence would not be needed. The tax-avoidance loans the second sentence deals with have more indicia of consumer loans than they do of investment

With due respect, we cannot accept the construction below that Section 9 merely modifies Sections 7 and 8 of Revenue Ruling 68–630 excluding securities and money market obligations from the loan base (64 T.C. at 1007–1008). Rather, we approve of a subsequent decision of the Tax Court that Section 9 constitutes a separate ground for exclusion of loans from a bank's loan base beyond those exclusions set forth in earlier Sections of that Ruling. *Industrial Valley Bank & Trust Co. v. Commissioner of Internal Revenue,* 66 T.C. 272 (1976).

*State Bank of Albany v. United States,* 530 F.2d 1379 (Ct.Cl.1976), is not to the contrary. There the Court of Claims held that the words "Government insured loans" in IRS Mim. 6209 (1947–2 Cum.Bull. 26) should be given their plain meaning, excluding state and local government notes. As a result, the court held that certain state notes had been properly included in the bank's loan base for purposes of computing the bank's bad debt reserve. In the present case, giving Section 9 of Revenue Ruling 68–630 its plain meaning results, as we shall see, in excepting the TDAs from the loan base. In contrast to IRS Mim. 6209 which operated to include certain state loans in the Albany Bank's loan base, nothing in the present regulation "brings into effect something analogous to a binding contract" (76–1 USTC at 83,604) that TDAs are meant to be included in a bank's loan base. In addition, the state notes there involved had "a varying element of risk" (*id.* at 83,606) unlike these TDAs, where taxpayer has produced no evidence of a history of default.

Similarly, *Pullman Trust & Savings Bank v. United States,* 235 F.Supp. 317 (N.D.Ill. 1963), affirmed *per curiam,* 338 F.2d 666 (7th Cir. 1964), does not support taxpayer's position, for it involved only IRS Mim. 6209 rather than anything akin to Section 9 of Revenue Ruling 68–630.

The principal question then becomes whether it was reasonable for the Commissioner to conclude that these TDAs were not representative of taxpayer's ordinary portfolio of outstanding customer loans, so that they must be excluded from the loan base. The reasonableness of the Commissioner's conclusion is apparent when various facets of the TDAs are considered. The Commercial Loan Department received no notes for the overdrafts nor was any interest or other charge imposed with respect to them.[8] Taxpayer made no profit on them, and no maturity dates or repayment schedules were imposed. As one of taxpayer's trust officers testified after studying the bank's records relating to the TDAs since 1968, none of the overdrafts was ever written off as uncollectible. The Tax Court specifically found that losses were minimal. Indeed, the parties stipulated that taxpayer experienced only nominal or *de minimis* losses. The bank's trust officers do not authorize an advance unless they are sure that the trust will receive sufficient funds to repay it. Not only do the advances originate from another department of the bank instead of directly from customers, but they are not even evaluated by taxpayer's commercial loan officers. As seen, the Commercial Loan Department daily advanced any overdraft increases to the Trust De-

---

activity. Therefore, if the first sentence was only such a broad exclusionary rule, such a rule would operate to allow tax-avoidance loans to be included in a taxpayer's loan base. Yet such "wrongly-motivated" loans are explicitly barred from inclusion into a taxpayer's loan base. Thus the exception clause of the first sentence of Section 9 is a general and independent principle of exclusion of which the "wrongly-motivated" loan of the second sentence is a specific example.

8. Taxpayer offers the following justifications for its failure to make a charge for its TDAs (Br. 4):

"Interest is not charged on Trust Department Advances for a number of reasons. One factor is the fact that positive cash balances of individual trust accounts do not earn interest; thus charging interest on negative balances would be inappropriate. (Tr. 26) In addition, the taxpayer's management made a business decision that trust accounts are good business relationships which may lead to additional commercial banking business. Therefore, interest on trust overdrafts is waived as an inducement to develop trust business. (Tr. 26)"

partment rather than to borrowers. These factors amply support the reasonableness of the Commissioner's conclusion that the TDAs were not representative of the bank's ordinary portfolio of outstanding customer loans.

Despite these numerous factors demonstrating that TDAs are not representative of taxpayer's ordinary portfolio of outstanding loans, taxpayer asserts that certain unspecified regulations of the Comptroller of the Currency indicate that TDAs should be treated as loans for tax purposes. Taxpayer's Commercial Loan Department maintains two accounts for TDAs. As detailed above, the asset account—"Trust Department Advances"—treats the TDA as a loan receivable. Under instructions issued by the Comptroller, this account must be included by taxpayer in a category termed "other loans" for purposes of taxpayer's call report to the Comptroller. To maintain accounting symmetry, the loan department also keeps a liability account entitled "Trust Department Deposits." This liability account is included in the Federal Deposit Insurance Corporation base on which taxpayer pays assessments and is included in the calculation of taxpayer's reserve requirements under the Federal Reserve System. Conversely, the Trust Department treats TDAs in a liability account—"Trust Advances"—as loans payable, while TDAs are entered in an asset account entitled "Trust Department Deposits." Apparently the Comptroller's regulations also require taxpayer to borrow funds covering these overdrafts from the commercial section of the bank or another appropriate source.

■ But any regulations of the Comptroller of the Currency requiring that TDAs be accounted for as loans in certain situations are immaterial to whether TDAs are properly loans for purposes of Section 166(c).[9] That Section deals with "loans" definable as a matter of economic reality rather than merely as a matter of accounting formalism. When it is recalled that Section 166(c) of the Code only permits a deduction for a *reasonable* addition to a reserve for bad debts, the instant deduction should not qualify since the record shows that no losses can be anticipated with respect to these TDAs. See *Dixie Furniture Co. v. Commissioner of Internal Revenue*, 390 F.2d 139, 141 (8th Cir. 1968).

The opinion below recognized that only loans in which an element of risk is present should be considered by a bank in computing additions to bad debt reserves. 64 T.C. at 1008.[10] Yet the Tax Court ignored the factual record in the present case by concluding that "a loan entails an element of risk and is not reasonably excluded from the loan base when the lending bank advances funds without having under its control cash items or balances which it can apply immediately to reduce the amount of outstanding indebtedness" (64 T.C. at 1010). While that is true of many loans, it is not true of these TDAs since no losses have ever occurred.

In contending that TDAs are not within the exception contained in Section 9 of Revenue Ruling 68–630, taxpayer relies on a proposed regulation defining what constitutes a "loan" eligible for inclusion in the loan base for taxable years beginning after July 1, 1969. That proposal presumes "a loan made in the ordinary course of business of the taxpayer * * * to be representative of the taxpayer's ordinary portfolio of outstanding customer loans."[11] Taxpayer's reliance is misplaced. In the first place, the proposed regulation does not apply to the taxable year 1968. Moreover, the TDAs are arguably not "a loan made in the ordinary course of business of the taxpayer," thus not engaging the presumption.

---

**9.** As the Commissioner points out in his reply brief (p. 2):

"Banks are undoubtedly required to account for Government-insured loans, as well as other advances clearly disqualified from inclusion in their loan bases, as loans by these regulations."

**10.** See Revenue Ruling 63–122, 1963–2 Cum. Bull. 98 at 98–99. This principle was incorporated into Revenue Ruling 68–630 (see Sections 4 and 13 thereof), as Judge Fay noted (64 T.C. at 1008).

**11.** Proposed regulation § 1.585(2)–(e)(2)(ii).

Finally, the proposed regulation has been redrafted to confine eligible loans or debts to those "incurred in the course of the normal customer loan activities of a financial institution * * * ."[12] Accordingly, the current draft of the proposed regulation would also seem to exclude TDAs.

Taxpayer next places reliance on the fact that Section 4 of Revenue Ruling 68–630 includes an overdraft "in one or more deposit accounts of a customer" as "an outstanding loan eligible for inclusion in the loan base * * * ." Instead of helping taxpayer, Section 4 undermines its position because the Commissioner has only made overdrafts in deposit accounts eligible for inclusion in the loan base. Since the TDAs are not such overdrafts, they must meet the requirement of Section 9 of Revenue Ruling 68–630 and, as seen, they do not qualify under that provision.

Taxpayer also seeks comfort from *First Trust & Savings Bank of Davenport, Iowa v. United States*, 301 F.Supp. 194 (S.D.Ia. 1969), involving home mortgage loans. Section 9 of Revenue Ruling 68–630 was not involved in that case. In any event, the loans there would clearly be representative of the bank's ordinary portfolio of outstanding customer loans. Similarly, *First Wisconsin Bankshares Corp. v. United States*, 369 F.Supp. 1034 (E.D.Wis.1973), did not concern Section 9 of Revenue Ruling 68–630. Even if it had, the construction loans made to three non-profit corporations would seem to be typical customer loans and therefore within Section 9.

Finally, taxpayer asserts that the April 13, 1964, closing agreement entered into with the Commissioner under 26 U.S.C. § 7121 bars him from excluding these TDAs from its 1968 loan base. The statute accords finality only to the very agreement, and it was specifically confined to the amount of the bank's reserve for bad debts on January 1, 1958, and does not estop the Commissioner in later years.[13] *Dixie Furniture Co. v. Commissioner of Internal Revenue*, 390 F.2d 139, 141–142 (8th Cir. 1968).

Under the test adopted in the *Akron National Bank & Trust Co., supra*, and other cases,[14] we hold that the Commissioner's application of Section 166(c) and Section 9 of Revenue Ruling 68–630 to these facts was reasonable. There being no abuse of discretion on the Commissioner's part, taxpayer may not enlarge its bad debt reserve to cover the TDAs.

The decision of the Tax Court is reversed.

---

12. See revised proposed regulation § 1.585–2(e)(3)(i) published at 41 Fed.Reg. 40482 (Sept. 20, 1976).

13. Indeed, as the Commissioner points out in his reply brief (pp. 9–10):

"* * * if taxpayer's position is correct—that the agreement has the effect of binding both parties to computing the reserve in the same manner as that used in the closing agreement—taxpayer would not be entitled to use the method set forth in Rev.Rul. 65–92, 1965–1 Cum.Bull. 112, as clarified by Rev. Rul. 68–630, *supra*, since the 1958 balance as agreed was computed under Mim. 6209, 1974–2 Cum.Bull. 26, which was superseded by Rev.Rul. 65–92, *supra*."

14. See, *e. g., Merchants Industrial Bank v. Commissioner of Internal Revenue*, 475 F.2d 1063, 1065 (10th Cir. 1973); *American State Bank v. United States*, 279 F.2d 585, 589–590 (7th Cir. 1960), certiorari denied, 364 U.S. 881, 81 S.Ct. 170, 5 L.Ed.2d 103.